June 1, 1999

NO. 5-97-0900

IN THE 

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_________________________________________________________________

GINA TRIMBLE PARKS and DOUGLAS PARKS,)  Appeal from the

                                     )  Circuit Court of

     Plaintiffs-Appellants,          )  St. Clair County.  

                                     )  

v.                                   )  No. 95-L-308

                                     )  

REVEREND RAYMOND KOWNACKI, THE       )

CATHOLIC DIOCESE OF BELLEVILLE, INC.,)

and ST. MARTIN OF TOURS ROMAN        )

CATHOLIC CHURCH,                     )  Honorable

                                     )  Lloyd A. Cueto, 

     Defendants-Appellees.           )  Judge, presiding.  

_________________________________________________________________

JUSTICE CHAPMAN delivered the opinion of the court:  

The following facts are true.

In 1955, during President Eisenhower's first term in office and two years before Sputnik was launched, Gina Trimble was born into a devout Roman Catholic family.  Her family believed that, in order to live their lives correctly and to receive God's blessings, they had to follow the teachings of the Roman Catholic Church without question.  Gina and her eight brothers and sisters attended Young Catholic Training classes at St. Francis Xavier Church.

In 1970, during President Nixon's first term in office and one year after man's first moon walk, Gina was 15 years old.  In 1970, defendant Catholic Diocese of Belleville (Diocese) assigned Father Raymond Kownacki to be the parish priest of St. Francis Xavier Church in St. Francisville, Illinois.  Father Kownacki gained Gina's trust and respect during the Young Catholic Training classes, and he employed her to clean the St. Francis Xavier Church rectory.

One Saturday in the fall of 1970, while Gina was cleaning Father Kownacki's bedroom, he raped her.  

Father Kownacki told Gina that he loved her and that she must never tell anyone about his sexual assault of her, for, if she did, not only Gina but the entire Trimble family would be excommunicated from the Roman Catholic Church.  In early 1971, Father Kownacki told Gina that he was being transferred to defendant St. Martin of Tours Roman Catholic Church (St. Martin) and that he was going to take her with him.  Gina did not want to go with him, but she was afraid to tell anyone why she did not want to go.  

Father Kownacki convinced the Trimble family that Gina needed a higher education than what she was getting in public school, that she was not being challenged, that she should be allowed to accompany him to St. Martin, where she would get a much better education, and that she would be able to more fully develop her artistic talents at St. Paul's Catholic High School (St. Paul's).  Father Kownacki further attempted to ingratiate himself with the Trimble family by providing financial assistance.

Although Gina was filled with shame and guilt at the thought of moving to Washington Park, she could not bring herself to visit this shame and guilt upon her family in the small, very Catholic, rural community where she had been raised.  She believed she could not disclose to anyone what Father Kownacki had done to her.  Father Kownacki obtained and exercised virtually complete psychological control, domination, and authority over Gina.

Gina moved into the church rectory in Washington Park with Father Kownacki in the summer of 1971.  At age 16, Gina was expected to do the housekeeping, cooking, and laundry for Father Kownacki while she attended school at St. Paul's.  Father Kownacki continued to exert such psychological control over Gina that in the evenings she served as his mistress, submitting to sexual intercourse when Father Kownacki required it, which was  approximately once or twice a week.  Father Kownacki encouraged Gina to drink alcohol, particularly before he planned sexual activity.  Father Kownacki was also abusing alcohol throughout this period of time.  

Father Kownacki encouraged and insisted that Gina date boys for appearances' sake, but she was not to have a sexual relationship with anyone but Father Kownacki.  Gina could not confide in anyone about the way Father Kownacki was using her and sexually abusing her, because of the warnings and threats he made earlier and that he continued to make.  In about December of 1971, Gina began dating a boy Father Kownacki introduced to her.  She dated this boy steadily thereafter.

In the fall of 1972 Gina attempted to refuse to have intercourse with Father Kownacki and locked her bedroom door.  But Father Kownacki had a key, and he forced his way inside her room and forced her to have intercourse.  He did this on numerous occasions.  Father Kownacki took photographs of Gina nude and threatened to send them to the Trimble family if she refused to have intercourse with him or disclosed his sexual abuse of her.  After taking her to a sexually explicit movie, Father Kownacki physically forced Gina to perform fellatio on him.  Fellatio became his preferred method of sexual gratification, and he repeatedly required Gina to perform fellatio on him.  This was even more revolting to Gina than the sexual intercourse that she had been  previously forced to endure.

In January 1973 Gina had intercourse with the boy she had been dating for the past year.  When she returned to the church rectory that evening, Father Kownacki was waiting for her.  He was angry and intoxicated.  He threatened her life and raped her.

For the next several months Gina did not see her boyfriend.  She also learned that she was pregnant.  She met with her boyfriend to inform him of her pregnancy.  Gina believed that her boyfriend was the father of her baby because Father Kownacki claimed to have had a vasectomy in Guatemala.  Her boyfriend took her to a doctor, who confirmed the pregnancy.  Gina's boyfriend then promised to marry Gina and care for her and their baby.

In approximately March of 1973, Gina came home late after seeing her boyfriend.  Father Kownacki flew into a drunken rage.  He grabbed her hair, beat her head against the wall and the floor, and beat her with the chair.  Gina told Father Kownacki she was pregnant, and she fought back physically.  Gina told Father Kownacki that she was going to marry her boyfriend, have the baby, and get out of his life and that no one would ever know about her and Father Kownacki.  In an attempt to end the beating she was receiving, Gina swore to Father Kownacki that she would never tell about his sexual abuse of her.  Father Kownacki again flew into a rage, began again to beat Gina, and screamed at her that if he could not have her, no one would.

Father Kownacki advised Gina that there was no way she could have a baby.  He required her to drink a potion that he told her was a quinine mixture used in Central America to abort babies that are not wanted.  Gina, who felt completely at the mercy of Father Kownacki at this point, drank the potion, began feeling very tired and weak, and went to her bedroom to lie down.  Father Kownacki then entered her bedroom, removed Gina's slacks and underpants, inserted his entire hand into Gina's vagina and wrenched and squeezed her uterus.  Gina passed out.  She has only vague recollections of the events that followed.  Gina does remember waking up and finding herself lying in a pool of blood.  She somehow got back to her home in Allendale.  

Shortly thereafter, Gina self-aborted a dead fetus at home.  She was taken, along with the fetus, to the Wabash General Hospital in Mt. Carmel, Illinois.  Gina  was also treated for endometriosis and toxemia.  She was informed that if had she not been hospitalized, she would not have lived.

After Gina recovered, she returned to Washington Park in approximately April of 1973, to pick up her belongings from the church rectory.  She was accompanied by her father and mother.  Father Kownacki was present when they arrived.  Gina's father threatened Father Kownacki, but Father Kownacki responded that no one would believe Gina's story and that no one could "touch him."  As Gina left the Church rectory, Father Kownacki warned her that he would always know where she was and that she could never escape him.  

Father Dean J. Braun is a Roman Catholic priest.  He succeeded Father Kownacki as priest at St. Francis Xavier Church, and he is an employee of the Diocese.  Bishop Albert Zuroweste is a Roman Catholic priest and an employee of the Diocese.

Gina, her parents, and Father Braun visited with Bishop Zuroweste to inform him of Gina's treatment at the hands of Father Kownacki.  Bishop Zuroweste was told of Father Kownacki's sexual abuse of Gina.  Bishop Zuroweste took no notes and showed little interest in Gina or her claims, but he assured Gina that he would handle the matter.  Upon leaving Bishop Zuroweste's office, Father Braun advised Gina and her parents that it appeared that Bishop Zuroweste would not discipline Father Kownacki and that Gina must forgive Father Kownacki and forget his physical and sexual abuse of her. 

Shortly after returning from Bishop Zuroweste's office, Father Braun took Gina to the rectory at St. Mary's Church in Mount Carmel, Illinois, a Diocesan church.  He placed a ritualistic vestment on his shoulders, anointed Gina with oil, prayed over her in Latin, and while anointing her with oil, told her that she must give up her anger and that she must forgive Father Kownacki and forget what he had done to her or her soul would die.  Father Braun intended by this ceremony to induce Gina to forget the treatment she received at the hands of Father Kownacki and to prevent Gina from pursuing any claims against the Diocese and/or Father Kownacki.  Gina awakened the morning after the powerful ritualistic ceremony feeling as though a huge burden had been removed from her shoulders.

Gina's fear of Father Kownacki, his threats to excommunicate Gina's family, the powerful ritualistic ceremony performed by Father Braun, the failure of Bishop Zuroweste (whom she perceived to be the highest church authority accessible to her) to discipline Father Kownacki, which reinforced Father Kownacki's statement that he was untouchable,  Gina's failure to understand the psychological impact of the injuries she suffered at the hands of Father Kownacki, the failure of Bishop Zuroweste and Father Braun to report Father Kownacki's criminal behavior to the criminal justice authorities, as well as Gina's repressed memory of many of the events, all combined to render Gina psychologically incapable of pursuing her claims against defendants until she was contacted by a representative of the Diocese.  This contact occurred shortly prior to the filing of her complaint in February 1995.

Bishop Zuroweste promised to discipline Father Kownacki, and his failure to keep that promise, combined with Father Braun's ritualistic ceremony and their combined failure to report Father Kownacki's criminal behavior, diverted Gina from pursuing her claims against Father Kownacki by psychologically preventing her from taking responsibility to care for herself and prevented her from having psychological closure with regard to the abuse to which she was subjected under the control of Father Kownacki and the Diocese.  Bishop Zuroweste and Father Braun psychologically restrained Gina from obtaining any remedies for the wrong she suffered at the hands of Father Kownacki.

The lay reader of this horrid tale of rape and ritual within the Roman Catholic Church might wonder about the bold assertion in this opinion's first sentence that the following facts are true.  Lawyers, of course, are well aware that the law requires them to accept the facts in a complaint as true for purposes of considering motions to dismiss the complaint.  See 
Bryson v. News America Publications, Inc.
, 174 Ill. 2d 77, 672 N.E.2d 1207 (1996).  A motion to dismiss is saying that, assuming that all the facts in the complaint are true, the plaintiff is still not entitled to recover.  See 
Barber-Colman v. A & K Midwest Insulation Co.
, 236 Ill. App. 3d 1065, 603 N.E.2d 1215 (1992).   

The defense of this case in the trial court focused on the statute of repose for childhood sexual abuse (735 ILCS 5/13-202.2(b) (West 1992)) and the statute of limitations (735 ILCS 5/13-202 (West 1992)).  Defendants claim that Gina Trimble Parks's claim is barred by those statutes because she did not bring it within 12 years of reaching her majority or within two years of the time she knew or should have known that she had been wrongfully treated.

Defendants challenged the viability of plaintiffs' claims by filing various motions.  Some defendants filed motions to dismiss based on section 2-615 and/or section 2-619 (735 ILCS 5/2-615, 2-

619 (West 1992)), and all defendants filed motions for summary judgment based on section 2-1005 (735 ILCS 5/2-1005 (West 1992)).  The trial court examined the materials submitted in support of the summary judgment motions and denied each of them.  Our review of the record leads us to conclude that the trial court was correct in its finding that the materials submitted create genuine issues of material fact which would preclude the entry of a summary judgment order.

The next item to examine is the trial court's ruling on the motions to dismiss.  The trial court concluded that the statute of repose for childhood sexual abuse (735 ILCS 5/13-202.2(b) (West 1992)) extinguished the plaintiffs' claims.  

The statute providing a statute of limitations and a statute of repose for childhood sexual abuse went into effect in 1991 and provided in pertinent part as follows:  

"(a) In this Section:  

`Childhood sexual abuse' means an act of sexual abuse that occurs when the person abused is under 18 years of age. 

`Sexual abuse' includes but is not limited to sexual conduct and sexual penetration as defined in Section 12-12 of the Criminal Code of 1961.

(b)  An action for damages for personal injury based on childhood sexual abuse must be commenced within 2 years of the date the person abused discovers or through the use of reasonable diligence should discover that the act of childhood sexual abuse occurred and that the injury was caused by the childhood sexual abuse, 
but in no event may an action for personal injury based on childhood sexual abuse be commenced more than 12 years after the date on which the person abused attains the age of 18 years
."  (Emphasis added.)  735 ILCS 5/13-202.2 (West 1992).    

In 1994 the legislature deleted the 12-year statute of repose. Public Act 88-127, eff. January 1, 1994.  The complaint in this case was filed February 28, 1995, but the supreme court's decision in 
M.E.H. v. L.H.
, 177 Ill. 2d 207, 685 N.E.2d 335 (1997), makes it clear that the repose provision in the statute applies to this case.

Plaintiffs contend that some of the acts complained of occurred after Gina's eighteenth birthday and that the statute of repose for childhood sexual abuse cannot act as a bar to those actions.  Defendants contend that, even if the statute of repose is not a bar to the claims based on acts committed after Gina's eighteenth birthday, those claims are barred by the two-year statute of limitations for personal injuries.  See 735 ILCS 5/13-

202 (West 1992).  Plaintiffs also contend that even if the statute of repose for childhood sexual abuse and the statute of limitations would ordinarily bar Gina's claims, the statutes do not in this case for several reasons.  The two reasons we will examine are (1) defendants should be estopped from raising the statutory bars or (2) Gina was under a legal disability that tolled the application of the statutes.

To establish a basis for equitable estoppel, a party must show that (1) the other party misrepresented or concealed a material fact, (2) the other party had either express or implied knowledge that the representations were untrue at the time they were made, (3) the party asserting estoppel was unaware of the true facts at the time they were made and acted upon, (4) the other party intended or expected the representation or conduct to be acted upon, (5) the party asserting estoppel did in fact rely on the representations or conduct, and (6) the party asserting estoppel would be prejudiced if the other party is not estopped.  Moreover, the doctrine of equitable estoppel will not apply to a case if the defendant's conduct terminated within ample time to allow the plaintiff to still avail himself of any legal rights he may have had.  See 
Serafin v. Seith
, 284 Ill. App. 3d 577, 672 N.E.2d 302, 311 (1996); 
Pack v. Santa Fe Park Enterprises, Inc.
, 209 Ill. App. 3d 648, 568 N.E.2d 360, 363 (1991).

The trial court's order only briefly addressed plaintiffs' estoppel claim, when it stated, "[T]here wasn't any contact between [Gina] and Kownacki for 15 years preceding the filing of this case."  Although this statement may be accurate as to Father Kownacki's contact with Gina, it overlooks the contacts and, more importantly, the effects of the contacts that Father Braun and Bishop Zuroweste had with Gina.  According to the facts in plaintiffs' complaint, which, as we have indicated, must be accepted as true, when Gina and her devout parents met with Father Braun and Bishop Zuroweste, the following events occurred.  Although Bishop Zuroweste told them he would handle the matter, he appeared to take little interest in it.  In addition, after the family left Bishop Zuroweste's office, Father Braun told them that it appeared Bishop Zuroweste would not discipline Father Kownacki and that Gina must forgive Father Kownacki and forget his physical and sexual abuse of her.  

In addition to those statements to Gina, Father Braun also took her to the rectory at St. Mary's Church in Mt. Carmel, Illinois.  While they were in the rectory, Father Braun placed a ritualistic vestment on his shoulders, anointed Gina with oil, prayed over her in Latin, and while anointing her with oil, told her that she must release her anger and forgive Father Kownacki and forget what he had done to her.

Gina contends that because of Father Kownacki's threats and the action and/or inactions of Father Braun and Bishop Zuroweste, she was incapable of taking any legal action until shortly before her suit was filed in February 1995.  Defendants contend that Gina had knowledge of the acts complained of and could have brought an action at any time after her eighteenth birthday.  Defendants rely upon this court's decision in 
Benton v. Vonnahmen
, 288 Ill. App. 3d 199, 679 N.E.2d 1270 (1997), to support their statutory defenses.  
Benton
, however, is distinguishable because there was no claim of either estoppel or legal disability presented to the court in that case.

The power of sincerely held religious beliefs and the effect of those beliefs on those who hold them is not limited to the young or to members of the Roman Catholic Church.  Members of the Jehovah's Witnesses Church refuse blood transfusions even when such refusals may cause them to die.  See 
In re E.G.
, 133 Ill. 2d 98, 549 N.E.2d 322 (1989); 
In re Estate of Brooks
, 32 Ill. 2d 361, 205 N.E.2d 435 (1965).  This conduct has not been limited to adult's decisions over their own lives.  Parents have even been willing to see their child die rather than to allow blood transfusions.  See 
In re E.G.
, 133 Ill. 2d 98, 549 N.E.2d 322 (1990).  

Although the preceding two cases both involved members of Jehovah's Witnesses Church, that church is not alone in having members who possess religious convictions so deep that they are willing to die, or allow their children to die, rather than violate church doctrine.  See 
People v. Rippberger
, 231 Cal. App. 3d 1667, 283 Cal. Rptr. 111 (1991) (Christian Scientist Church); 
Quigley v. First Church of Christ, Scientist
, 65 Cal. App. 4th 1027, 76 Cal. Rptr. 2d 792 (1998) (Christian Scientist Church).

These decisions are not presented in any spirit of approval or disapproval of the religious beliefs held or the judicial rulings resolving the crises the beliefs created.  The cases are presented as a means of suggesting the power that religious beliefs can exert over people who sincerely hold those beliefs.

In a childhood sexual abuse case such as this one, it is not only the power of religious belief that comes into play, it is also the effect of the sexual abuse on the psychological condition of the victim.  See D. Finkelhor, A Sourcebook on Child Sexual Abuse 161-65 (1986); McCleer, 
Post-traumatic Stress Disorder in Sexually Abused Children
, J. 27(5) Am. Acad. Child & Adolescent Psychiatry 650-54 (1988); Roth & Friedman, Childhood Trauma Remembered:  A Report on the Current Scientific Knowledge Base & Its Applications, J. 7(1) Child Sexual Abuse, 83-107 (1998).

Thus, there are both religious and secular bases for Gina's claims for equitable estoppel and legal disability, and both of them support her arguments against a statutory bar of her claims.

Whether Gina's allegations will eventually be proven is unknown to us at this time.  What is known, however, is that we must accept her allegations as true when considering motions to dismiss the complaint.  See 
Bryson v. News America Publications, Inc.
, 174 Ill. 2d 77, 672 N.E.2d 1207 (1996).   Taking as true these allegations of threats, unfulfilled promises, and rituals intended to bring about forgiveness, forgetfulness, and forbearance, we conclude that they support Gina's claims of equitable estoppel and her claim of legal disability.  Defendants spend a great deal of time in their briefs detailing the amount of knowledge and memory of the events that Gina possessed both before and after her eighteenth birthday.  However, defendants' arguments that are based on her knowledge are obviously fact-based contentions that were resolved by the trial court when it denied defendants' summary judgment motions because there were disputed factual issues.  The dispute before this court is not whether certain facts are true or even whether there is a genuine dispute over material facts.  The dispute to be resolved on this appeal is whether the allegations in the complaint state a cause of action and, more particularly, whether the allegations set forth viable claims of estoppel and/or legal disability.  Since we conclude that they do and since the trial court has already denied defendants' motion for summary judgment, the only items remaining to be done on these issues are the completion of discovery and the trial of the case.  The trial court's judgment is reversed, and the cause is remanded to accomplish those purposes.

In addition to their main defenses, which are based on the statutes of limitations and repose, defendants Diocese and St. Martin also assert that the trial court's dismissal order can be affirmed because there (a) is no vicarious liability on their part for Father Kownacki's conduct (see 
Randi F. v. High Ridge YMCA
, 170 Ill. App. 3d 962, 524 N.E.2d 966 (C.D. Ill. 1988)), (b) there is no duty of care owed by a church to its parishioners (see 
Maryland Casualty Co. v. Havey
, 887 F. Supp. 195 (C.D. Ill. 1995)), and (c) the first amendment's freedom of religion protection prevents the church and the diocese from being responsible for negligently hiring a priest who molests its young members (see 
Young v. Northern Illinois Conference of Methodist Church
, 818 F. Supp. 1206 (N.D. Ill. 1993), 
aff’d
, 21 F.3d 184 (7th Cir. 1994); 
Lemon v. Kurtzman
, 403 U.S. 602, 29 L. Ed. 2d 745, 91 S. Ct. 2105 (1971)).   Turning first to an examination of defendants' point (a), it is defendants' contention that they cannot be held responsible for Father Kownacki's acts of sexual molestation because those acts were outside the scope of his employment.  They cite, 
inter alia
, 
Randi F. v. High Ridge YMCA
, 170 Ill. App. 3d 962, 524 N.E.2d 66 (1988).  Plaintiffs suggest that 
Randi F.
 is distinguishable factually because Gina was Father Kownacki's housekeeper and lived at the parish.  Plaintiffs also suggest that Diocesan policy and Roman Catholic Canon law, both of which, according to plaintiffs, require priests to employ only persons of mature age, require a different result in this case.  We need not inquire too deeply into either of these suggestions as we conclude that this case is governed by 
Kigin v. Woodmen of World Insurance Co.
, 185 Ill. App. 3d 400, 541 N.E.2d 735 (1989), which adopted section 317 of the second Restatement of Torts (Restatement (Second) of Torts §317 (1965)).  

Section 317 imposes a duty upon employers to exercise reasonable care in controlling employees to prevent them from intentionally harming others when:

"(a)  The servant

(i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or

(ii) is using a chattel of the master, and

(b)  the master

(i) knows or has reason to know that he has the ability to control his servant, and

(ii) knows or should know of the necessity and opportunity for exercising such control."  Restatement (Second) of Torts §317, at 125 (1965).  

Certainly, Kownacki was on the premises of St. Martin only by his appointment as pastor by the Diocese, and the Diocese knew that it had the ability to control Kownacki, and the Diocese knew that Father Kownacki had a 16-year-old girl living at the rectory.

The court's application of section 317 in 
Kigin v. Woodmen of World Insurance Co.
, 185 Ill. App. 3d 400, 541 N.E.2d 735 (1989), is instructive.  In that case, a camp counselor sexually abused a 15-year-old guest at a youth camp.  Although the defendant employer did not know that the counselor was sexually abusive, it did know that the counselor had been intoxicated and had provided alcohol to the plaintiff.  The court noted that to allow the counselor, a 41-

year-old man, "`to be isolated with a 15-year-old girl at a remote location outside the presence of other sober adults *** was a formula for disaster.'"  
Kigin
, 185 Ill. App. 3d at 403, 541 N.E.2d at 737. 

In this case, a mature priest has been charged with sexually abusing a 15-year-old parishioner.  Gina also charges Father Kownacki with being an alcohol abuser and of plying her with alcohol.  In addition, Gina charges that St. Martin and the Diocese had direct supervision and control of Father Kownacki and that both of those defendants knew or should have known that he was a child abuser and an alcohol abuser.  Almost all of the sexual abuse occurred on church property that Father Kownacki occupied solely because of his position as a priest and as guardian.  Finally, this was a situation that existed, not for one evening as in 
Kigin,
 but for years.  If the limited time in 
Kigin
 established a recipe for disaster, the extended opportunities available to Father Kownacki certainly called for the exercise of control by the church and the diocese and precludes an order of dismissal on this basis.  

Point (b), defendants' second auxiliary line of attack, is their claim that there is no duty of care owed by a church or the diocese to its parishioners, a contention for which they cite 
Maryland Casualty Co. v. Havey
, 887 F. Supp. 195 (C.D. Ill. 1995).  It is not necessary for us to delve into the question of whether 
Havey
 would be an appropriate statement of the law under the circumstances alleged in this case, nor is it necessary for us to recognize a special relationship between clergy and parishioners as other states have done (see, 
e.g.
, 
Moser v. Diocese of Colorado
, 863 P.2d 310 (Colo. 1993).  We conclude that both the church and the diocese can be responsible because of the guardian/ward relationship created when Father Kownacki was allowed to keep a teenage girl in the rectory as his housekeeper, to send her to school far from her parents and family, and to, at a minimum, exercise all the control over her that a legal guardian would be allowed to exercise.  A fiduciary duty exists between a guardian and a ward.  See 
In re Estate of Osborn
, 128 Ill. App. 3d 453, 470 N.E.2d 1114 (1984).  A caretaker of a child has a duty to protect the child from harm.  See 
People v. Watson
, 103 Ill. App. 3d 992, 431 N.E.2d 1350 (1982).  The duty to protect from harm certainly encompasses a duty to refrain from harming and to restrain others within one's control from harming.  Under the facts alleged in this case, a duty of care exists because of the guardian/ward relationship.

In point (c), defendants contend that the first amendment protects the church and them from liability for negligently hiring child molesters.  We fail to see any reasonable basis for such an argument.  The first amendment's freedom of religion clause has lofty goals; the protection of sexual abusers of children under the facts alleged in this case is not one of them.   

Plaintiffs have consistently contended that count XI was not subject to dismissal based upon the statutes of limitation and repose because it was based upon acts of the Diocese in late 1994.  To the extent that count XI is based on those acts and the damages that may flow from those acts, we agree that the statutes of limitation and repose would not act as a bar, and therefore, our decision to reverse as to count XI, and to allow plaintiffs the opportunity to file an amendment to it, is not based on either estoppel or legal disability.  This conclusion is particularly significant for the claim of Gina's husband, Douglas, because count XI will be the only count upon which he may be entitled to recover.  This is so because, although we are reversing and remanding for a resolution of Gina's claim, the same result is not mandated for the claims of Douglas.  Our conclusion to reverse the trial court's order is based on the theories of equitable estoppel and legal disability that are peculiar to Gina.  These theories do not transfer to Douglas' claims that are contained in counts XIII and XIV.  Therefore, the trial court's orders dismissing these counts are affirmed.

In summary, the trial court is affirmed as to counts XIII and XIV.  The trial court is reversed as to counts I through XI, and this case is remanded for proceedings consistent with this opinion.

Affirmed in part and reversed in part; cause remanded.  

WELCH, J., and HOPKINS, J., concur.