GINA TRIMBLE PARKS *et al.*, Appellees, v. RAYMOND KOWNACKI *et al.*, Appellants.

*Opinion filed August 10, 2000.—Rehearing denied October 2, 2000.*

FREEMAN, J., specially concurring.
HARRISON, C.J., dissenting.

Theodore J. MacDonald, Jr., Daniel W. Farroll and Sarah C. Day, of Burroughs, Hepler, Broom, MacDonald & Hebrank, of Edwardsville, for appellant Raymond Kownacki.

David Wells and Bruce D. Ryder, of St. Louis, Missouri (Thompson & Coburn LLP, of counsel), for appellant Catholic Diocese of Belleville, Inc.

Thomas Q. Keefe, Jr., of Belleville, for appellant St. Martin of Tours Roman Catholic Church.

J. Michael Weilmuenster, of Kassly, Bone, English & Weilmuenster, P.C., of Belleville, and Alan H. Silverman and Robert W. Smith, of Silverman, Smith & Bingen, P.C., of Kalamazoo, Michigan, for appellees.

JUSTICE RATHJE delivered the opinion of the court:
The issue presented is whether plaintiff's second amended complaint, which contains 14 counts relating to her alleged sexual abuse by a Roman Catholic priest, is barred by the statute of limitations.

# BACKGROUND

Summary of Proceedings Below

On February 28, 1995, plaintiffs Gina and Douglas Parks filed a complaint against defendants Reverend Raymond Kownacki, St. Martin of Tours Roman Catholic Church (the Parish), and the Catholic Diocese of Belleville (the Diocese) in the circuit court of St. Clair County. Plaintiffs amended their complaint twice, and plaintiffs' second amended complaint (the complaint) contained 14 counts. Defendants filed motions for summary judgment (735 ILCS 5/2—1005(b) (West 1998)) and motions to dismiss (735 ILCS 5/2—615, 2—619(a)(5) (West 1998)). The trial court denied the motions for summary judgment but dismissed the action, finding that plaintiffs' claims were barred by the statute of repose for childhood sexual abuse claims (735 ILCS 5/13—202.2 (West 1992)) and the statute of limitations for personal injury claims (735 ILCS 5/13—202 (West 1998)). The appellate court affirmed as to counts XIII and XIV of the complaint, which were loss of consortium claims made by Douglas. 305 Ill. App. 3d 449, 462. The appellate court reversed as to counts I through XI, holding that equitable estoppel precluded defendants from asserting a statute of limitations defense and that Gina was under a legal disability, and remanded the cause for further proceedings. 305 Ill. App. 3d at 462 . Defendants filed petitions for leave to appeal, which we allowed (177 Ill. 2d R. 315(a)). Plaintiffs do not challenge the dismissal of counts XIII and XIV. As a result, those counts are not before this court.[1]

Complaint

The following facts are alleged in the complaint, and we accept them as true for purposes of our review of the

[1]Count XII is also not before us as the appellate court did not address it, and its failure to do so was not challenged.

rulings on defendants' motions to dismiss. See *Calloway v. Kinkelaar*, 168 Ill. 2d 312, 325 (1995).

In 1970, Kownacki, an employee of the Diocese, was assigned to work as a Roman Catholic parish priest at the Church of St. Francis Xavier in St. Francisville. Plaintiff[2] and her family were members of that church. Kownacki employed plaintiff as a housekeeper at the St. Francis Xavier rectory. Plaintiff was 15 years old in 1970.

One day during the fall of 1970, plaintiff was at the rectory cleaning Kownacki's bedroom when Kownacki interrupted to show her a "little voodoo trick." Kownacki instructed plaintiff to chant, and he turned off the lights. He then raped plaintiff. Afterwards, Kownacki told plaintiff that he loved her and that she should trust him. He threatened that the Roman Catholic Church would excommunicate plaintiff and her family if she revealed that he had sexually assaulted her. From the time of this warning until recently, plaintiff has felt that she could not report Kownacki to anyone and that she had sinned through her relationship with Kownacki. The rape negatively affected both plaintiff's academic performance and her emotional state.

In early 1971, Kownacki told plaintiff that he was being transferred to the Parish, which is located in Washington Park. He convinced plaintiff's parents that plaintiff should accompany him to the Parish so that she could go to a school in Highland, where she would receive a "higher" education and develop her artistic talents. Kownacki also provided financial assistance to plaintiff's family. Plaintiff did not want to accompany Kownacki but did so because he had complete psychological control, domination, and authority over her. After Kownacki arranged for plaintiff to move to the Parish, he also ar-

---

[2]Because counts XIII and XIV were Douglas' only claims and are not a part of this appeal, our use of the word "plaintiff" in the remainder of this opinion will refer only to Gina.

ranged for plaintiff, who was 16, to accompany him on a trip to his ailing mother's home in Pinkneyville. There, plaintiff assisted Kownacki's mother with the cleaning. While they were there, Kownacki touched plaintiff in a sexual manner.

In the summer of 1971, plaintiff moved with Kownacki to the rectory at the Parish. The Parish is supervised by the Diocese, and Kownacki was an employee of the Parish. While there, plaintiff served as his housekeeper and his mistress. In addition, she attended St. Paul's Catholic High School. When Kownacki accepted the responsibility of plaintiff's care and education, he took on the role of her guardian, even though he was not given that title by a court. Kownacki instructed plaintiff to tell anyone who asked about their relationship that she and Kownacki were distant cousins. He also threatened to send nude photographs of plaintiff to her parents if she refused Kownacki's sexual advances or told anyone about the abuse. Moreover, after he took her to a sexually explicit movie, Kownacki forced plaintiff to perform fellatio on him. Fellatio then became his preferred method of sexual gratification. In the fall of 1972, plaintiff began having problems at school. The principal and a supervising employee of the Diocese both asked her if Kownacki was sexually abusing her. Plaintiff denied that she had been abused.

In January 1973, plaintiff had sexual intercourse with a boy whom she had been dating for over a year. When she returned to the rectory, Kownacki was in a drunken, angered state and accused her of having had sex with the boy after Kownacki had instructed her not to have sexual contact with anyone but him. Kownacki then held a gun to his head. When plaintiff said that she would no longer have sex with Kownacki, he put down the gun and held a knife to her throat. He then pointed the gun at her and forced her to drive him in the car, where he threatened

to kill both her and himself. When they returned home, Kownacki raped her and told her never to see the boy again.

Plaintiff later learned that she was pregnant. Kownacki had told her that he had been given a vasectomy in Guatemala. Consequently, she believed that the boy she had dated was the one who had impregnated her. When she told the boy, the boy told her that he would marry her and take care of her and the baby. Plaintiff returned home late that day, and Kownacki "flew into a drunken rage." He beat her head against the wall and beat her with a metal chair. Plaintiff then told Kownacki that she was pregnant and that she planned to marry the boy. She swore that she would keep Kownacki's sexual abuse secret. Kownacki got angry again, and plaintiff knocked him unconscious and attempted to run away. The police returned her to Kownacki. Kownacki then gave plaintiff a quinine mixture to drink that he characterized as a potion "used in Central America to abort babies that are not wanted." After drinking the mixture, plaintiff felt tired and weak so she went to lie down. Kownacki then entered her bedroom and removed her slacks and underpants. He reached into her vagina and squeezed her uterus.

The next thing that plaintiff recalled was awakening to find herself lying in a pool of blood. She found her way back to her parents' home, where she aborted a dead fetus shortly after she arrived. In March of 1973, plaintiff was treated at a hospital where she had a dilation and curettage. She was also treated for endometriosis and toxemia. At the hospital, plaintiff was told that, had she been brought to the hospital any later, she would have died.

Plaintiff and her parents returned to the rectory at the Parish in approximately April 1973 and gathered her belongings. While they were there, Kownacki told them

that no one could "touch him" and that plaintiff's story would not be believed. He warned plaintiff that she could not escape him.

Father Dean J. Braun, an employee of the Diocese, had become the new parish priest at St. Francis Xavier after Kownacki was transferred. He took plaintiff and her parents to meet with Bishop Albert Zuroweste, who was also an employee of the Diocese. Plaintiff told Zuroweste of Kownacki's abuse. Zuroweste told plaintiff that he would take care of the matter. After the meeting, Braun advised plaintiff and her family that Zuroweste would not discipline Father Kownacki and told her that she should forgive Kownacki and forget about the abuse. In fact, Zuroweste did not discipline Kownacki but instead assigned him to a new parish in Salem. Neither Zuroweste nor Braun ever contacted the criminal authorities about Kownacki's actions.

After the meeting, Braun took plaintiff to the rectory at St. Mary's Church in Mount Carmel, where he anointed her with oil and again told her to forgive and forget. Braun intended that the ceremony would cause plaintiff to forgive and forget Kownacki's abuse and prevent her from pursuing claims against Kownacki and the Diocese. Braun's actions changed plaintiff's brain functions; plaintiff felt "as though a huge burden had been removed from her shoulders."

Since the ceremony, Kownacki has intentionally intimidated plaintiff twice: by letter and through a contact by an unknown individual to plaintiff's husband. Kownacki also had bragged about having connections to organized crime. Braun advised plaintiff that the CIA was investigating Kownacki.

Because of plaintiff's fear of Kownacki, Braun's ceremony, Zuroweste's failure to discipline Kownacki, plaintiff's failure to understand that Kownacki had caused her psychological injury, the failure of Zuroweste

and Braun to report Kownacki to the police, and plaintiff's repressed memory of many events, plaintiff was "psychiatrically incapable of pursuing her claims *** prior to the filing of this complaint." Plaintiff did not realize that her sexual relationship with Kownacki was sexual abuse or that she had been injured by that abuse. Both Braun's ceremony and the failure of Zuroweste to discipline Kownacki acted as a psychiatric restraint on plaintiff, and she was unable "to make any decisions, or exercise judgment, about any of the sexual and physical abuse that she suffered at the hands of Father Kownacki."

In late 1994, plaintiff learned that Marjorie Menson of Catholic Social Services was trying to contact her. When plaintiff spoke to Menson in early 1995, Menson said that she was contacting plaintiff on behalf of the Diocese. Menson asked plaintiff if Kownacki had abused plaintiff, and plaintiff answered in the affirmative. This contact caused plaintiff's memories of the abuse to resurface and led her to relive the experiences of the abuse. When plaintiff discovered that her disclosure had led to Kownacki's removal from his ministry, plaintiff feared and still fears retaliation. The psychiatric restraint created by Braun's ceremony was in place until that 1995 contact with the Diocese. Since the ceremony, plaintiff suffered from a "limited degree of mental incompetence" that "constituted a legal disability resulting in [plaintiff's] psychiatric inability to pursue a legal remedy *** until such time as it was removed when the Diocese contacted [plaintiff] in early 1995."

Plaintiff currently suffers from post-traumatic stress disorder. She has suffered several other injuries as a result of defendants' actions and inactions, including physical injuries relating to her forced abortion, mental distress and anguish, loss of self-esteem, and loss of enjoyment of life. Plaintiff was also unable to develop

her artistic talents and has lost income and earning potential. She has suffered and continues to suffer from depression. In addition, plaintiff has suffered from various physical injuries and has suffered nightmares and lost sleep. Her companionship with her husband, parents, and siblings has also been affected negatively by defendants.

Based on these facts, plaintiff argues several theories of liability against defendants. Plaintiff advances claims against Kownacki of childhood sexual abuse, breach of fiduciary duty, intentional infliction of emotional distress, negligence, and willful and wanton conduct. Plaintiff's claims against the Parish are breach of fiduciary duty, *respondeat superior*, failure to warn, negligence, negligent supervision and retention, and willful and wanton conduct. Plaintiff makes these same claims against the Diocese and also claims negligent infliction of emotional distress.

The only claim that relates to any events after 1973 is the portion of count XI that alleges negligent infliction of emotional distress based upon the Diocese's 1995 contact with plaintiff through Marjorie Menson. Plaintiff alleges that the Diocese had a duty to refrain from making such an inquiry about Kownacki's abuse without first assessing its effect on plaintiff. The inquiry caused plaintiff to suffer severe emotional distress and physical injuries.

## Motions to Dismiss

Kownacki, the Parish, and the Diocese all filed motions to dismiss under section 2—619(a)(5) of the Code of Civil Procedure (the Code) (735 ILCS 5/2—619(a)(5) (West 1998)), alleging that plaintiff's claims were barred by the statute of limitations and the statute of repose. The alleged abuse occurred from 1971 to 1973. Plaintiff turned 18 in 1973; however, she did not file a complaint until 1995, 22 years later. Defendants alleged that the

complaint makes clear that plaintiff was aware of her claims when she turned 18. The Diocese and the Parish also claimed that the complaint should be dismissed under section 2—615 of the Code (735 ILCS 5/2—615 (West 1998)) because they were not vicariously liable for Kownacki's sexual abuse for two reasons: (1) the sexual abuse was outside of the scope of his employment; and (2) defendants owed plaintiff no duty. Additionally, the Diocese and the Parish argued that judicial inquiry into the hiring and discipline of Kownacki by the Diocese and/or the Parish would constitute unconstitutional excessive entanglement with religion. In particular, the Diocese challenged count XI of the complaint, negligent infliction of emotional distress, arguing that the allegations were contradictory.

Plaintiff responded to defendants' motions to dismiss. In addition to directly responding to defendants' allegations, plaintiff argued that plaintiff's legal disability tolled the statute of limitations and that equitable estoppel precluded defendants from raising a statute of limitations defense.

The affidavit of Dr. Frank Ochberg is attached to plaintiff's response. Ochberg, a psychiatrist and neurologist, affies that plaintiff was under the psychological power of Kownacki during the entire time that Kownacki abused her. According to Ochberg, plaintiff "regained her ability to report *** her victimization" after the abortion, but Zuroweste's "promise to take care of the problem" and Braun's "ritualistic ceremony" combined to "psychiatrically prevent[ ]" plaintiff from pursuing a remedy. The ceremony rendered plaintiff unable to make any decisions or exercise any judgment concerning Kownacki's sexual abuse. As a result, plaintiff was "psychiatrically incapable of taking any action" against defendants from the time of the ceremony until 1995, when the Diocese contacted plaintiff. Plaintiff suffered

symptoms of post-traumatic stress disorder before December of 1994 but since the Diocese contact has developed "full blown" post-traumatic stress disorder. Plaintiff did not comprehend the connection between the disorder and the sexual abuse for 21 years, and she "has suffered from a limited degree of mental incompetence between the time that Father Braun anointed her with oil and told her to forgive and forget Father Raymond Kownacki in 1973 and her conversation with the social worker, hired by the Diocese of Belleville, in early 1995." Ochberg concludes that plaintiff suffered a "legal disability resulting in [her] psychiatric inability to pursue a legal remedy."

## ANALYSIS

Defendants ask us to reverse the appellate court, which reversed the trial court's dismissal of plaintiff's complaint. We review *de novo* the granting of a section 2—619 motion to dismiss. *Kedzie & 103rd Currency Exchange, Inc. v. Hodge*, 156 Ill. 2d 112, 116 (1993). Under section 2—619(a)(5) of the Code of Civil Procedure, a defendant moves to dismiss because the "action was not commenced within the time limited by law." 735 ILCS 5/2—619(a)(5) (West 1998). We must determine whether the existence of a genuine issue of material fact should have precluded the dismissal or, absent such issue, whether dismissal is proper as a matter of law. *Doyle v. Holy Cross Hospital*, 186 Ill. 2d 104, 109-10 (1999).

### Claims Based on Alleged Sexual Abuse

#### *Statute of Limitations*

Defendants argue that the complaint is barred by the statute of limitations because plaintiff failed to file her complaint within two years of discovering that she had been sexually abused and that she had been harmed by that abuse. Although plaintiff admits that she was always aware of the abuse since the time it occurred, she argues that the statute of limitations did not attach until the

1995 contact because, until then, she was not aware of the connection between the abuse and her injuries.

An action for personal injury must be filed "within 2 years next after the cause of action accrued." 735 ILCS 5/13—202 (West 1998). If the plaintiff is a minor, "he or she may bring the action within 2 years after the person attains the age of 18 years." 735 ILCS 5/13—211 (West 1998).

Under the discovery rule, the limitations period begins to run when the party seeking relief "knows or reasonably should know of his injury and also knows or reasonably should know that it was wrongfully caused." *Knox College v. Celotex Corp.*, 88 Ill. 2d 407, 415 (1981). The limitations period begins running even if the plaintiff does not know that the misconduct was actionable. *Knox College*, 88 Ill. 2d at 415. When a plaintiff alleging childhood sexual abuse was aware of the abuse as it occurred and does not allege that she repressed the memories of that abuse, the limitations period begins to run at the time the plaintiff reaches the age of majority. *Clay v. Kuhl*, 189 Ill. 2d 603, 610 (2000).

In *Clay*, the plaintiff alleged that she had been sexually abused by a priest from childhood into her teenage years. The abuse took place in the early seventies. The complaint was not brought until 1996. Although the plaintiff admitted that her memories of the abuse had not been repressed, she claimed that the statute of limitations was tolled because she did not connect her injuries with the abuse until 1994. Her psychologist affied that " 'she was unable to comprehend that the tragic course that her life was on, until quite recently, was, at least in part, due to what the priest did to her.' " *Clay*, 189 Ill. 2d at 609.

This court determined that, because the plaintiff was "always aware of the misconduct charged," did not claim that her memories of the abuse were repressed, and

postponed filing her complaint until 13 years after she reached the age of majority, her complaint was time-barred as a matter of law. *Clay*, 189 Ill. 2d at 610. Even though some of the plaintiff's injuries were not fully apparent until years after the abuse, this court did "not believe that the plaintiff's alleged failure to fully discover the nature of her injuries is sufficient to delay the running of the limitations period." *Clay*, 189 Ill. 2d at 611.

The facts in this case are almost identical to *Clay*. Plaintiff alleges that Kownacki, a priest, sexually abused plaintiff in the early seventies when plaintiff was a teenager. The last incident of abuse occurred in early 1973. Although the complaint does not allege plaintiff's exact date of birth, it does allege that she was 15 in 1970 and 16 in early 1971. Therefore, plaintiff had reached the age of 18 by early 1973. She did not file her complaint until 1995.

Like the plaintiff in *Clay*, plaintiff alleges only that she failed to make the connection between her injury and the abuse, not that she did not remember that she had been abused. While she alleges that she did not know that the sexual relationship was wrong, it is clear from her actions—telling her parents, reporting Kownacki to Zuroweste—that she knew that Kownacki had wronged her. Plaintiff did plead that some details relating to the abuse were repressed; however, she does not claim that this is the reason that the limitations period is tolled. Instead, she contends that her failure to realize that the abuse had caused her injuries tolled the limitations period until 1995.

Ochberg, like the psychiatrist in *Clay*, affied that plaintiff did not understand the connection between her post-traumatic stress disorder and the sexual abuse for 21 years. Although plaintiff was not aware of her post-traumatic stress disorder until recently, one particular injury that plaintiff claims, the forced abortion, obviously

was apparent when plaintiff went to the hospital and was given a dilation and curettage. Plaintiff reasonably should have been aware of that injury at that time as well as its likely cause. As discussed above, she was also aware that Kownacki had done something wrong to her. Because in this case it is even more evident than in *Clay* that plaintiff was aware of both the cause and some injury, we hold that plaintiff's failure to understand the connection between the abuse and other injuries does not toll the statute of limitations. As a result, the claims arising from plaintiff's alleged sexual abuse are time-barred.

### Legal Disability

Plaintiff claims that, even if her claims would have been time-barred, the limitations period was tolled because she was under a legal disability until the 1995 contact with the Diocese. According to plaintiff, because of her psychiatric condition, she was unable to pursue a remedy. She argues that this condition is a legal disability sufficient to toll the statute of limitations under section 13—211 of the Code (735 ILCS 5/13—211 (West 1998)).

When a potential plaintiff has a legal disability, the statute of limitations is tolled until the plaintiff is no longer disabled. 735 ILCS 5/13—211 (West 1998). A "person under legal disability" is defined as a person who has some disability or incapacity that prevents her from being "fully able to manage his or her person or estate." 5 ILCS 70/1.06 (West 1998). Although a person need not be adjudicated disabled to have a legal disability (*Clark v. Jae Eun Han*, 272 Ill. App. 3d 981, 987-88 (1995); *Estate of Riha v. Christ Hospital*, 187 Ill. App. 3d 752, 755 (1989)), she must have some argument that her disability is one contemplated by the legislature (see *Bruso v. Alexian Brothers Hospital*, 178 Ill. 2d 445, 456-57 (1997)).

Here, plaintiff alleges only that defendants' conduct rendered her "psychiatrically unable" to take legal action. She does not allege that she has had any difficulty managing her person or her estate. In fact, plaintiff specifically admitted in oral argument that she does *not* make this claim. She argues only that the "ritual" performed by a priest to induce her to forgive and forget the abuse prevented her from filing a complaint. The gist of plaintiff's claim is that, because she had some mental impairment that kept her from filing a complaint and because that impairment was caused by defendants, the limitations period should be tolled.

Plaintiff's claim must fail. She admits that the only manifestation of her alleged "legal disability" consists of an inability to file a civil complaint. The inability to pursue a legal remedy does not, standing alone, fall into any recognized category of legal disability. Moreover, the fact that defendants may have been responsible for plaintiff's inability to pursue legal relief does not transform that inability into a legal disability. We therefore hold that plaintiff has not pleaded facts sufficient to indicate that the limitations period should be tolled.

## Equitable Estoppel

Plaintiff next argues that, even if her claims are barred by the statute of limitations, equitable estoppel precludes defendants from asserting a statute of limitations defense. Plaintiff contends that defendants should not profit from acts that they have committed that have harmed plaintiff. Plaintiff argues that, because defendants' actions and inactions caused plaintiff to be unable psychologically to file a complaint, they should be estopped from asserting a statute of limitations defense. Plaintiff also claims that the fiduciary duty between plaintiff and Kownacki requires that equitable estoppel be applied. She bases this argument on the premise that

a fiduciary can commit fraud by failing to reveal facts and need not commit an affirmative misrepresentation.

To establish equitable estoppel, the party claiming estoppel must demonstrate that: (1) the other party misrepresented or concealed material facts; (2) the other party knew at the time the representations were made that the representations were untrue; (3) the party claiming estoppel did not know that the representations were untrue when the representations were made and when they were acted upon; (4) the other party intended or reasonably expected the representations to be acted upon by the party claiming estoppel or by the public generally; (5) the party claiming estoppel reasonably relied upon the representations in good faith and to their detriment; and (6) the party claiming estoppel has been prejudiced by his reliance on the representations. *Vaughn v. Speaker*, 126 Ill. 2d 150, 162-63 (1988).

Plaintiff clearly has not pleaded the elements of equitable estoppel. She does not allege that any defendant misrepresented or concealed any material fact. She alleges only that defendants asked plaintiff to forgive them and to refrain from suing them. In fact, at oral argument plaintiff admitted that she could not demonstrate a misrepresentation or concealment. Without the misrepresentation or concealment of a material fact, equitable estoppel does not apply. *McInerney v. Charter Golf, Inc.*, 176 Ill. 2d 482, 492 (1997); *City of Jacksonville v. Padgett*, 413 Ill. 189, 199 (1952). Accordingly, plaintiff has failed to sufficiently allege the elements of equitable estoppel.

Plaintiff's argument that a fiduciary duty between her and Kownacki allows equitable estoppel to apply was not presented to the trial court by plaintiff. Questions not raised in the trial court cannot be argued for the first time on appeal. *Ragan v. Columbia Mutual Insurance Co.*, 183 Ill. 2d 342, 355 (1998). Therefore, this issue is waived.

Plaintiff has failed to demonstrate that the principles of equitable estoppel prohibit defendants from raising the statute of limitations as a defense.

## Conclusion

Plaintiff has neither demonstrated that a legal disability tolled the limitations period nor shown that equitable estoppel prevents defendants from raising the statute of limitations as a defense. As a result, plaintiff's claims based on her allegations of sexual abuse are time-barred, and we reverse the appellate court as to those claims.

## Claim Based on Diocese's 1995 Contact

### Failure to State a Claim

In part of count XI, plaintiff claims that the Diocese negligently inflicted emotional distress when it contacted her in 1995. According to the complaint, plaintiff learned that the Diocese was attempting to contact her through Menson in late 1994, and plaintiff contacted Menson in 1995. She alleges that the Diocese failed to properly consider the effect such a contact would have on plaintiff. She claims that this contact caused her severe emotional distress and physical injuries.

For a direct victim to state a claim of negligent infliction of emotional distress, she must allege: (1) that defendant owed plaintiff a duty; (2) that defendant breached that duty; and (3) that plaintiff's injury was proximately caused by that breach. *Corgan v. Muehling*, 143 Ill. 2d 296, 306 (1991). If plaintiff has not alleged facts sufficient to impose a duty on defendant, plaintiff has failed to state a claim, and the action should be dismissed. *Cunis v. Brennan*, 56 Ill. 2d 372, 374 (1974).

The duty that plaintiff alleges in this case is novel. According to plaintiff, the Diocese owed a duty to assess the emotional and psychological impact of an investigatory contact before making that contact. We are unaware

of any such duty under Illinois law, and plaintiff fails to cite any authority in support of her allegation. Accordingly, we hold that the portion of plaintiff's count XI that alleges that the Diocese negligently inflicted emotional distress on plaintiff through the 1995 contact fails to allege a legally cognizable duty and therefore fails to state a claim upon which relief can be granted.

## Conclusion

Plaintiff's claim of negligent infliction of emotional distress based on the 1995 contact with the Diocese fails to state a claim upon which relief can be granted. Although the Diocese argued that the claim was time-barred and that adjudication of that claim would be constitutionally impermissible, we do not reach those arguments because we have already disposed of count XI.

## CONCLUSION

We reverse the decision of the appellate court and affirm the decision of the trial court in which the trial court dismissed plaintiff's complaint in its entirety.

*Appellate court judgment reversed;*
*circuit court judgment affirmed.*

JUSTICE FREEMAN, specially concurring:

I agree with the result in this case. I write separately because I do not endorse the reasoning by which the majority arrives at its conclusion. The majority determines that the victim's claims for childhood sexual abuse are time-barred based solely on *Clay v. Kuhl*, 189 Ill. 2d 603 (2000). I continue to adhere to my belief that *Clay* was wrongly decided. See *Clay*, 189 Ill. 2d at 615-22 (Freeman, J., dissenting, joined by Harrison, C.J.). Nevertheless, the facts in this case differ so dramatically from the facts in *Clay*, that I concur that dismissal is appropriate here.

As the majority correctly holds, it is impossible to

conclude that the victim in this case was, as she contends, unaware of *any* injury until early 1995. The victim specifically alleges in her complaint that she was "filled with shame and guilt and horror" at the thought of moving in with her abuser in 1971. Her abuser at various times held a knife to her throat, threatened her with a gun, beat her with his hands and a metal chair and engaged in sexual activities with her by force. Moreover, after becoming pregnant plaintiff aborted the fetus as a result of physical assault by her abuser and, when taken to a hospital, was informed that she had very nearly died. These facts differ markedly from those alleged in the plaintiff's complaint in *Clay*. *Cf. Clay*, 189 Ill. 2d at 608-09 (victim alleged that the sexual contact with her abuser was not forcible and that she was never physically harmed). Accordingly, the rule illegitimately applied in *Clay* correctly operates to bar plaintiff's complaint in this case. See *Clay*, 189 Ill. 2d at 611-13 ("discovery rule" delays commencement of limitations period only until the plaintiff becomes aware of some injury, not until the plaintiff realizes the full extent of her injuries), citing *Golla v. General Motors Corp.*, 167 Ill. 2d 353 (1995).

CHIEF JUSTICE HARRISON, dissenting:

I cannot concur in the majority's cursory disposition of count XI of plaintiff's complaint. While the duty asserted by plaintiff in that count may be novel, the mere absence of precedent does not render it untenable. If the only cognizable legal principles were the ones already acknowledged by the courts in this state, we could not have abrogated sovereign immunity as to school districts (see *Molitor v. Kaneland Community Unit District No. 302*, 18 Ill. 2d 11 (1959)) or abolished contributory negligence (see *Alvis v. Ribar*, 85 Ill. 2d 1 (1981)). Indeed, our common law would never have been able to advance beyond the doctrines in effect under the English monarchs. *Amann v. Faidy*, 415 Ill. 422, 433 (1953).

The outstanding characteristic of our system of judicial decisionmaking is its adaptability and capacity for growth. Ours " 'is a system of elementary rules and of general judicial declarations of principles, which are continually expanding with the progress of society, adapting themselves to the gradual changes of trade, commerce, arts, inventions and the exigencies and usages of the country.' " *Amann v. Faidy*, 415 Ill. at 433-34, quoting *Kreitz v. Behrensmeyer*, 149 Ill. 496, 502 (1894). Accordingly, where new situations arise which we have not considered, we should not hesitate to consider whether the common law should be extended or modified to cover them.

Finding no precedent for the situation alleged in count XI, the court should have undertaken its own analysis as to whether the Diocese owed plaintiff a duty. There is nothing sacrosanct about the legal concept of duty. Duty is no more than an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection. *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 453 (1992).

Whether a duty exists is a question of law and depends on whether the defendant and plaintiff stood in such a relationship to one another that the law imposed upon the defendant an obligation of reasonable conduct for the benefit of plaintiff. *Ward v. K mart Corp.*, 136 Ill. 2d 132, 140 (1990). The factors relevant to the courts' imposition of a duty include the likelihood of injury, the reasonable foreseeability of such injury, the magnitude of guarding against the injury, and the consequences of placing that burden on the defendant. *Jackson v. TLC Associates, Inc.*, 185 Ill. 2d 418, 425 (1998).

In this case, I think it quite likely and foreseeable that the Diocese's contact with Mrs. Parks in 1995 would result in injury to her. Any form of sexual abuse is

potentially debilitating. The type suffered by Mrs. Parks was especially horrific. The Diocese should have realized that the social worker's investigation of the matter would cause Mrs. Parks' memories to resurface and rekindle her fears of retaliation, triggering the type of severe emotional distress, sleeplessness and nightmares she ultimately experienced. The burden to the Diocese of assessing the effects of the investigation on Mrs. Parks prior to making contact would not have been significant, and there would have been no significant adverse consequences if the Diocese had been required to make such an assessment. I would therefore affirm the appellate court's judgment reversing the circuit court's dismissal of count XI.

In my view, we should also affirm that part of the appellate court's judgment reversing the circuit court's dismissal of counts I through X. Although the claims asserted in those counts were filed beyond the applicable limitations and repose periods, the record before us shows that Mrs. Parks was under duress. Father Kownacki threatened her and her family, boasted of his ties to organized crime and claimed he was untouchable, a claim buttressed by the church's failure to take action against him.

Where a defendant uses duress to prevent the plaintiff from filing suit or otherwise enforcing her legal rights, as Kownacki is alleged to have done here, the duress tolls the running of the limitations period. 54 C.J.S. *Limitations of Actions* § 92 (1987). Based on the allegations in Mrs. Parks' complaint, Kownacki's wrongdoing may be imputed to the Diocese and the Parish. Accordingly, the duress applied by Kownacki tolled the time limitations against those defendants as well. The circuit court therefore erred in dismissing counts I through X, and the appellate court was correct in reversing that part of the circuit court's judgment.