Alta T. CLAY, Plaintiff,

v.

**SOTHEBY'S CHICAGO, INC., Defendant.**

No. C–3–99–426.

United States District Court, S.D. Ohio, Western Division.

Jan. 17, 2003.

Paul Roger Leonard, Springboro, OH, Harold Robert Farquhar, Dayton, OH, for Plaintiff.

Charles Joseph Faruki, Jeffrey S. Sharkey, Faruki Ireland & Cox PLL–3, Dayton, OH, for Defendant.

EXPANDED OPINION; DECISION AND ENTRY OVERRULING DEFENDANT'S MOTION FOR SANCTIONS (DOC. # 37); SUSTAINING IN PART AND OVERRULING IN PART DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT (DOC. # 42)

RICE, Chief Judge.

Plaintiff Alta T. Clay ("Clay") originally filed her Complaint (Doc. # 1 at Ex. A) in the Greene County (Ohio) Common Pleas Court against Defendant Sotheby's Chicago, Inc. ("Sotheby's").[1] Upon Sotheby's Notice of Removal (Doc. # 1), the case was removed to this Court. Clay's claim against Sotheby's arises from a failed consignment agreement between the two parties,[2] through which Sotheby's was to sell, at auction, some of her personal property. Clay raises several issues in her Complaint: that Sotheby's sold some of her property below value; that some items Clay alleges she had asked Sotheby's to withdraw from auction were actually sold; that Clay had to pay for the return of her unsold property; that some of the items returned were damaged while in Sotheby's possession; and that some unsold items were never returned to her. Sotheby's denies liability, and, in its Answer and Counterclaim (Doc. # 17), asserts three counterclaims: two for breach of the consignment contract, and a third seeking fees and costs pursuant to the terms of the contract.

Pending before the Court is Sotheby's Motion for Partial Summary Judgment (Doc. # 42), through which Sotheby's seeks summary judgment with respect to all of Clay's claims and two of its three counterclaims. Also pending is Sotheby's Motion for Sanctions (Doc. # 37), through which it seeks costs and expenses related to a failed discovery event that it claims Clay cancelled for harassment purposes.

## I. Factual Background [3]

Sotheby's is in the business of offering consigned property for sale at auction. (Davis Aff., attached to Doc. # 42 at Ex. 2.) On several occasions during the summer and fall of 1997, Clay met with Rebecca J. Davis, a representative of Sotheby's,[4] for the purpose of consigning numerous pieces of her antique collection to Sotheby's. (Clay Aff. ("Clay Aff. No. 2"), attached to Pl.'s Response to Def.'s Mot. for Part. Summ. J. (Doc. # 46), ¶ 3; Davis Aff. ¶¶ 2, 3.) The relationship was initiated by Clay. (Clay Depo. at 54.) Pursuant to their agreement, the property Clay offered for consignment was removed from her home in Beavercreek, Ohio, and taken to Chicago, where Sotheby's is located.

---

1. In the caption of the Complaint, Clay named "Sotheby's Midwest" as Defendant. Sotheby's pointed out that no such entity exists; hence, Clay and the Court have since recognized that "Sotheby's Chicago, Inc.," is the proper Defendant.

2. The original agreement was entered into by Clay with Leslie Hindman, Inc. Sotheby's purchased Leslie Hindman, Inc., and does not dispute that it is the successor-in-interest.

3. For purposes of ruling on Defendant's Motion for Partial Summary Judgment, the Court will construe the facts, and all reasonable inferences drawn therefrom, in a light most favorable to the Plaintiff, who is the non-moving party.

4. At the time, Davis was actually a representative of Leslie Hindman, Inc. (Davis Aff. ¶ 2, n. 1.) Because there is no disagreement as to the fact that Sotheby's is the successor-in-interest to Leslie Hindman, Inc., and because Sotheby's is the named Defendant, Davis will be referred to as a representative of Sotheby's in all respects.

(Clay Aff. No. 2 ¶ 3; Davis Aff. ¶ 3.) The property was packed, removed, and shipped on two dates: the first in July, 1997; the second in September, 1997. (Clay Aff. No. 2 ¶ 3; Davis Aff. ¶ 3.) On both occasions, Clay was present at her home to oversee the packing. (Davis Aff. ¶ 3.) She was not presented with a receipt for the items taken in the July shipment. (Clay Aff. No. 2 ¶ 4.)

Each item consigned to Sotheby's was given a "high" and "low" price estimate representing the range in value that Sotheby's estimated the item to be worth. Additionally, a "reserve" price was established for each item by agreement, representing the absolute minimum offering price that Sotheby's could accept for it at auction. (Davis Aff. ¶ 5.) At their September meeting, Clay signed the consignment contract, dated September 11, 1997.[5] (Id. ¶ 4). Subsequent to the signing, Clay and Davis went over the figures and set new high and low estimates, and new reserve prices. (Id. at 5.) At a later point in time, Davis mailed Clay an "updated" version of their consignment agreement, dated October 6, 1997, reflecting the new figures at which the two had arrived during their September meeting. (Id.) This edition of the contract has never been signed by Clay. Nevertheless, the material terms of the contract that are in dispute were not altered from the September version of the contract.

Several of Clay's antique pieces were sold at two separate auctions in October, 1997, the first held on October 14, and the second held October 19–21, following which Sotheby's remitted to Clay settlement checks pursuant to the consignment agreement. (Id. ¶ 9; Doc. # 42 at Ex. 5 & 6.)

Despite these sales, Clay's antique items apparently did not sell as well as either party had hoped, and, after an appeal by Clay to withdraw the items from sale, Sotheby's withdrew Clay's property from its scheduled December, 1997, auction. (Davis Aff. ¶¶ 7, 8.) Sotheby's maintains that Clay's property did not sell well, because she insisted on setting her reserve prices too high. (Id. ¶ 7.)

Some months later, in June and July of 1998, Jane Collins, on behalf of Clay, traveled on two occasions to Chicago to inspect, pack, and return ship Clay's unsold antiques to her. (Collins Aff., attached to Doc. # 46, ¶ 2.) Collins was never presented with an invoice for packing or storage fees. (Id. ¶ 9.)

In her Complaint, Clay alleges that Sotheby's was negligent in the sale of her property (First Claim). (Compl. ¶ 13.) She also seeks damages for the expense she incurred in retrieving her property from Chicago (Second Claim) (id. ¶ 16), for physical damage to various articles of the returned property for which she alleges Sotheby's is responsible (Third Claim) (id. ¶¶ 18, 19), and for two items of property that she alleges were neither sold nor returned by Sotheby's (Fourth Claim). (Id. ¶ 21.)

In its Counterclaim, Sotheby's claims that Clay breached her contractual obligations under the consignment agreement when she withdrew her property from the December, 1997, auction and neglected to pay the agreed-upon withdrawal fee (First Counterclaim) (Answer & Counterclaim ¶¶ 35–37), and again when she failed to pay storage fees owing for the period that her property was in storage at Sotheby's, be-

---

5. Clay contends that what she signed was merely a "receipt," and not a contract. (Clay Aff. No. 2 ¶ 5.) The Court has previously rejected this contention (see Doc. # 14 at 7), and will not review that finding. Accord-

ingly, the document signed by Clay, dated September 11, 1997, shall in all respects be considered, and be referred to as, a valid consignment contract.

tween the time she indicated her intention to withdraw and the time Collins retrieved the property (Second Counterclaim). (*Id.* ¶¶ 39–42.) Finally, Sotheby's seeks any costs, expenses, and fees associated with the underlying litigation pursuant to the terms of the consignment agreement (Third Counterclaim). (*Id.* ¶¶ 44, 45.)

As part of their joint discovery activities, the parties agreed that Sotheby's appraisal expert, Richard T. Nelson, would inspect the returned property in question, at Clay's residence, on October 26, 2000, following the taking of Clay's deposition. (Doc. # 37 at Ex. B at 1.) Due to alleged disorganization of the boxes in which the property was packaged, Sotheby's expert could not make much headway on the 26th, and agreed to return the following day, on October 27, 2000. (*Id.* at Ex. C at 2.) On the morning of the 27th, Clay stated that she was ill and that she would not allow the inspection to take place. (*Id.;* Clay Aff. ("Clay Aff. No. 1"), attached to Pl.'s Memo. in Opp. to Def.'s Mot. for Sanctions (Doc. # 40), ¶¶ 8, 9.) Clay initially expressed concern about being alone and ill in the house with three men. (Clay Aff. No. 1 ¶ 9.) Sotheby's attempted to allay Clay's concern by offering to include a woman in the group. (Doc. # 37 at Ex. C at 2.) Later in the morning, when Clay informed everyone that she would be checking into the hospital, Sotheby's suggested that the presence of Clay's counsel itself would guarantee the propriety of their actions in Clay's home, in her absence, and its counsel asked that the inspection proceed. (*Id.*) However, Clay refused all requests to allow the inspection to proceed. (*Id.*) Accordingly, it was necessary for the parties to reschedule a visit by Sotheby's expert.

Sotheby's contends that Clay purposefully feigned illness on October 27, 2000, in order to thwart the discovery process, and asks for sanctions. To augment its argument, Sotheby's claims that Clay has, throughout this litigation, employed delay tactics, such as failing to file her witness lists in a timely fashion or to participate in settlement negotiations. Clay denies that her illness was feigned or that she was trying to thwart discovery. (Clay Aff. No. 1 ¶ 14.)

## II. *Analysis*

The Court will first consider Sotheby's Motion for Sanctions (Doc. # 37), and then consider its Motion for Partial Summary Judgment (Doc. # 42).

### A. *Defendant's Motion for Sanctions (Doc. # 37)*

■ Sotheby's brings its Motion for Sanctions pursuant to Rules 34(b), 37(a), and 37(d) of the Federal Rules of Civil Procedure. Rule 34(b) establishes the procedure to be used by parties in arranging and conducting on-site discovery inspections. The rule itself does not provide for sanctions in the event of discord, but instead refers the aggrieved party to Rule 37(a), instructing said party to move for the appropriate order thereunder. Rule 37(a), in turn, is concerned with motions to compel, and the sanctions that may flow therefrom. Sotheby's has not moved to compel, either at any time previously in this litigation or within its immediate Motion for Sanctions. Therefore, to the extent Sotheby's seeks sanctions under Rules 34(b) and 37(a), the Court does not find the Motion well taken.

The Court also finds that sanctions under Rule 37(d) would not be appropriate. Rule 37(d) provides that a court may "make such orders … as are just" when one of three "failures" occurs, to wit: where, after proper notice has been served, (1) a party or other person scheduled for deposition under Rule 30(b)(6) or Rule 31(a) fails to appear; (2) a party fails

to answer or object to interrogatories submitted under Rule 33; or (3) a party fails to serve a written response to a request for inspection submitted under Rule 34. None of these three scenarios developed in this instance.

Sotheby's notes that this Court previously suggested that it would consider a motion for costs and fees "if there appeared to be some subterfuge" on Clay's part (Doc. # 37 at Ex. C at 2), but it goes without saying that such a motion must be procedurally firm. Furthermore, putting the procedural defect aside for the moment, it is hardly clear, given Clay's affidavit on the matter and the uncontroverted fact that she did, indeed, check into the hospital on October 27, 2000, that Clay was employing subterfuge to avoid cooperating in discovery. The Court is not persuaded by Sotheby's argument, and the underlying facts, that Clay's refusal to allow strangers into her home while she was ill, even if accompanied by her attorney, is indicative of subterfuge or bad faith. The Court is not any more persuaded by Sotheby's gratuitous arguments that Clay has continuously attempted to thwart the discovery process. The Court has yet to see in the record a motion to compel, and it has yet to see evidence of prejudicial delay. As a final matter, by all appearances, the inspection of the property in question was completed a few weeks later, in November of 2000. (Doc. # 40 at 3.)

It is within the vagaries of litigation that parties incur unexpected expenses. The Court finds Defendant's Motion for Sanctions (Doc. # 37) not well taken, and it is OVERRULED.

B. *Defendant's Motion for Partial Summary Judgment (Doc. # 42)*

After reviewing the standard governing the Court's summary judgment analysis, it will review the merits of Sotheby's Motion for Partial Summary Judgment as it relates to Clay's respective claims.

1. *Standards Governing Motions for Summary Judgment*

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Of course, the moving party:

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548; *see also Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991) (The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial") (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir.1987)). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)(quoting Fed.R.Civ.P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1245 (6th Cir.1995). Read together,

*Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law, Fed.R.Civ.P. 50). *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1478 (6th Cir.1989).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Michigan Protection and Advocacy Serv., Inc. v. Babin,* 18 F.3d 337, 341 (6th Cir. 1994) ("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff."). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are ... 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Hancock v. Dodson,* 958 F.2d 1367, 1374 (6th Cir.1992) (citation omitted). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, Federal Practice and Procedure, § 2726. In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir.1989), cert. denied, 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990); *see also L.S. Heath & Son, Inc. v. AT & T Information Sys., Inc.,* 9 F.3d 561 (7th Cir.1993); *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 915 n. 7 (5th Cir.), cert. denied, 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment ..."). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

2. *Sotheby's Motion for Summary Judgment as to Clay's Claims*

Sotheby's moves for summary judgment on all of the four claims plead in Clay's Complaint. The Court will consider the arguments in turn

a. *liability for negligence*

In her First Claim for Relief, Clay seeks damages of $175,000 owing to Sothe-

by's allegedly negligent sale of her property. (Compl. ¶ 13.) The elements that a plaintiff must prove to succeed on a claim for negligence in Ohio are: duty, breach of duty, causation, and damages. *See Anderson v. St. Francis–St. George Hosp., Inc.*, 77 Ohio St.3d 82, 671 N.E.2d 225, 227 (1996). Thus, to survive summary judgment, a plaintiff must adduce facts creating a genuine issue of material fact on each of these elements.

Clay bases her negligence claim on two contentions: *first*, that Sotheby's sold her property below market value; and *second*, that it sold some items contrary to her instructions that such not be sold.[6] It strikes the Court that this states a claim under contract, not tort. However, the Ohio Supreme Court stated a century ago that "actionable negligence exists ... when one negligently injures another to whom he owes the duty, created by contract or operation of law, of exercising care." *Baltimore & O.S.W.R. Co. v. Cox*, 66 Ohio St. 276, 64 N.E. 119, 120 (1902); *see also Palmer v. State Farm Mut. Auto. Ins. Co.*, 1986 WL 14068, at *2 (Ohio Ct. App.1986) (same) (citing *Cox, supra*). Because Sotheby's does not challenge the adequacy of the claim on this basis, the Court will assume that a claim for negligence has been stated properly.

■ With respect to Clay's first basis for her negligence claim, Sotheby's suggests in its Motion that, by definition, an auction sale determines market value, and that, therefore, it cannot be claimed with any legitimacy that Sotheby's sold any of Clay's property below market value. This argument has merit, particularly in the

absence of any allegations or evidence of fraud, collusion, or . other clandestine wrongdoing on the part of Sotheby's, which might lead to a finding that the auctions at which her property was sold did not operate as a true open market. Not only does Clay not offer any supporting facts to the contrary, she does not so much as offer an opposing argument of law. As there are no genuine issues of material fact regarding the propriety of the auctions at which her property was sold, the Court finds Clay's contention that Sotheby's sold her property below market value to be without merit, and that Sotheby's is entitled to judgment as a matter of law on this issue.

■ As for whether Sotheby's sold any items of Clay's against her wishes, the Complaint does not make clear at which auction, the first or the second of the October, 1997, auctions, Sotheby's did so. Sotheby's has presented evidence that despite having several conversations with Davis prior to the October 19–21 auction, Clay never requested that her reserve prices be lowered to facilitate greater sales, and never requested that her property be withdrawn. (*See* Davis Aff. ¶¶ 6 & 7.)

Clay does not address this issue in her Response. Indeed, it is Sotheby's itself that draws the Court's attention to the places in Clay's deposition that might conceivably be read as demonstrating that she gave specific instructions to Sotheby's to withdraw certain items. Prior to the October 14 auction, Clay made a request to a representative of Sotheby's to withdraw her property from sale. (*See* Clay Depo.

---

**6.** Clay also alleges that Sotheby's representatives removed property from her home that was not intended to be consigned. (Compl. ¶ 4.) This allegation appears irrelevant, because it has no real bearing on the damages she seeks in her First Claim (stated at paragraph 13), which relate solely to the alleged negligent sale of her property. Furthermore, Clay does not elaborate on the "wrongful removal" allegation in her Response, and without factual evidence to support same, the Court does not find that a genuine issue of material fact exists on this point.

at 167–68.) Nonetheless, as Sotheby's acknowledges, it sold six of Clay's items. These facts give rise to genuine issues regarding the existence of a duty, and a breach of same, to Clay, not to sell any property at the October 14th auction. Sotheby's argues, however, that it sold the items in conformity with the terms of the consignment contract. Furthermore, it notes that it properly remitted payment to Clay, pursuant to the consignment agreement, and that Clay has suffered no damages. The point of Sotheby's argument is that even if it had a duty to Clay and breached that duty, Clay has been fully remitted for her loss and thus has already been made whole, such that she would be unable to prove damages, which, as noted, is an essential element of a claim for negligence.

Sotheby's argument is well taken. By every appearance, Clay was justly compensated for the items which were arguably sold against her wishes, and she offers no facts to the contrary. Making matters even more difficult, Clay has proffered absolutely no argument in her Response that might lead the Court to consider an alternative basis for finding a genuine issue regarding damages, such as damages for lost "sentimental" value or the like. In the absence of a genuine issue regarding damages, it would be impossible for a reasonable trier of fact to conclude that Sotheby's was negligent in selling Clay's property against her wishes. It arguably did so in breach of its duty not to, but it subsequently made her whole, such that she has no remedy left in a court of law, on this theory. Accordingly, Sotheby's is entitled to judgment as a matter of law on this issue.

In sum, Clay's First Claim, for negligence, is not well taken, and Sotheby's Motion for Summary Judgment as to same is SUSTAINED.

### b. *liability for cost of return shipping Clay's property*

 In her Second Claim for Relief, Clay seeks recovery of $6,000 expended in cataloguing her property in Chicago and having it shipped back to Beavercreek. Sotheby's contends that, pursuant to the consignment agreement, the cost of return shipping was Clay's to bear. Again, Clay does not submit any argument on this point in her Response. However, in arguing against summary judgment on Sotheby's counterclaims, which are based on the consignment agreement, Clay argues that she did not formally enter into a contractual agreement with Sotheby's. By implication, then, the Court understands that Clay rejects Sotheby's argument as to her Second Claim on the same basis. Though not so stated by Clay, this claim has the appearance of one for quantum meruit, and will be construed as such.[7]

As Sotheby's notes, Clay's quantum meruit claim is foreclosed by the Court's earlier ruling denying Sotheby's motion to dismiss or transfer venue (Doc. #14), wherein the Court found that Clay did, in fact, contractually bind herself by signing the consignment agreement, notwithstanding Clay's own contention that she thought she was just signing a "receipt."

Pursuant to the consignment contract, the cost of shipping the property back to Beavercreek was Clay's to bear. Paragraph 3 of the contract states that "[p]acking, shipping and related charges to and/or

---

7. A quantum meruit cause of action arises in the absence of a contract, where the defendant has been unjustly enriched at the expense of the plaintiff, if the plaintiff had a reasonable expectation of being compensated by the defendant for his expense. *See, e.g., Reid, Johnson, Downes, Andrachik & Webster v. Lansberry,* 68 Ohio St.3d 570, 629 N.E.2d 431 (1994).

from our premises will be deducted from the proceeds of the sale *or billed to you*" (emphasis added). Given that Sotheby's retained the right to bill for the cost, it is illogical to find that it is required to reimburse therefor. Additionally, with respect to any property not sold at auction, paragraph 11 of the contract states that if a consignor chooses not to reconsign any such unsold property, then the responsibility for removal is on the consignor.[8] By putting the onus of removal on the consignor, the intention that all attendant costs should also be borne by the consignor seems clear. Furthermore, with respect to any property withdrawn by the consignor prior to auction, paragraph 10 of the contract contains a "no withdrawal" clause,[9] under which the consignor agrees to pay liquidated damages for doing so.[10] This clause further supports the finding that where property is withdrawn, the cost of the undertaking should be borne by the withdrawing party, as it would not be a cost that Sotheby's would have anticipated. Finally, Clay makes no argument on this point, giving the Court no reason to believe the contract should be construed in any other fashion.

Accordingly, the Court finds that there are no genuine issues of material fact on this issue, and that Sotheby's is entitled to judgment as a matter of law. Summary judgment is thus proper on Clay's Second Claim, construed herein as one based on quantum meruit, and Sotheby's Motion is SUSTAINED with respect thereto.

c. *liability for lost or damaged unsold property*

In her Third and Fourth Claims, Clay alleges, respectively, that some of her returned property was damaged, and that Sotheby's lost or did not return some items. The Court will consider these claims, which appear to be ones for negligence, together.

In discovery, Clay identified 150 items that were either lost or damaged. Sotheby's expert examined Clay's allegedly damaged property and opined that, for the most part, Clay's property showed only the normal signs of aging antiques. (*See* Expert Report of Richard T. Nelson, attached to Doc. # 42 at Ex. 3.) Nelson valued the total damage that Sotheby's might have inflicted to be $1,350. Clay's own expert valued damages, owing to either lost or

---

8. Paragraph 11 states in full:
 *Unsold Property.* In the event that Property does not sell, you may reconsign the Property with our consent. The following terms and conditions apply if you elect not to reconsign your unsold Property.
 a. All unsold Property must be removed from our premises after paying all commissions and expenses owed to us in full.
 b. Property will be held for pick-up without charge to you for a period of two (2) weeks following the auction. Thereafter, a charge of $1 per lot per day will be payable by you in consideration for storage.
 c. If Property is not reconsigned or picked up within sixty (60) days of notification, we may offer the Property for sale at auction without reserve and pay you the proceeds less all commissions and charges including storage fees.

9. The "no withdrawal" provision of paragraph 10 states that if the consignor does withdraw her property, she agrees to pay to Sotheby's twenty percent of the median of the most recent pre-sale estimate (i.e., the median between the latest high and low estimate) and any costs and expenses associated with the property.

10. Whereas paragraph 11 concerns the disposition of (unsold) property *after* auction, paragraph 10 concerns property withdrawn *prior* to auction. The Court finds that paragraph 3 governs the issue of which party is responsible for shipping and related costs. It makes note of paragraphs 10 and 11 only to emphasize how the language of those provisions support its construction of paragraph 3.

damaged property, at $17,550. (*See* Report of Marquis E. Boultinghouse, attached to Doc. # 46.)

Because there are genuine issues of material fact as to the extent to which Sotheby's may have damaged or lost Clay's property, summary judgment is not proper. On the Third and Fourth Claims, Sotheby's Motion is OVERRULED.

In sum, as it relates to Clay's cause of action, Sotheby's Motion for Summary Judgment (Doc. # 42) is SUSTAINED in part and OVERRULED in part, as stated herein.

### 3. *Sotheby's Motion for Summary Judgment as to Counterclaims*

In its First Counterclaim, Sotheby's seeks damages of $3,875, under paragraph 10 of the consignment contract, which provides that in the event the consignor withdraws her property from sale, she agrees to pay twenty percent of the median of the most recent pre-sale estimated value of the property in question. In its Second Counterclaim, Sotheby's seeks damages of $53,024 for storage costs, under paragraph 11 of the contract, for the cost of storing Clay's property from the time she withdrew it from sale[11] in late 1997, to the time Collins, on Clay's behalf, physically removed it in June and July of 1998.

In her Answer to Sotheby's counterclaims (Doc. # 19), Clay asserted the defenses of laches, waiver, and estoppel. In her Response to Defendant's Motion for Summary Judgment (Doc. # 46), Clay makes two general arguments. *First*, she argues that she was not aware she was signing a "contract," and that its terms were never explained to her. *Second*, at least with respect to the Second Counterclaim, she reasserts, though not expressly

stated as such, her defenses of waiver and estoppel.

#### a. *liability for withdrawal*

■ With respect to Sotheby's First Counterclaim, Clay admitted in her Answer thereto that she withdrew items from sale as alleged by Sotheby's. (Doc. # 19 ¶ 2.) She does not proffer any argument in response to Sotheby's summary judgment argument on this counterclaim other than to say that the terms of this provision were not explained to her until long after she signed the contract. This argument is not persuasive, given that the Court has already concluded that she did, in fact, enter into a contractual relationship with Sotheby's, the validity of which the Court has recognized. (*See* Doc. # 14.) She acknowledges that Sotheby's, in a letter to her dated December 23, 1997, expressed its right to enforce the terms of that provision. (*See* Doc. 46 at 4; Letter from Jamie Ritchie to Alta Clay of 12/23/97, attached to Doc. # 46 at Ex. 4, at 1.) Given this evidence, the Court finds both that Clay is bound under the terms of paragraph 10 of the consignment agreement and that Sotheby's did not waive its right to enforce this provision.

The amount Sotheby's seeks on its First Counterclaim, $3,875, represents 20% of the aggregated median pre-sale estimated prices of all of the pieces of property Clay withdrew from auction, as calculated by its expert, Nelson, pursuant to paragraph 10 of the contract. (*See* Doc. # 42 at Ex. 3, at 6–7, & attachments F & G.) The accuracy of this figure is not challenged by Clay, and the Court finds it well taken.

On Sotheby's First Counterclaim, the Court finds that there are no genuine issues of material fact as to liability or the

---

**11.** As noted *supra* note 8, the storage fees actually start accruing two weeks after the

last auction at which the property had been offered for sale.

amount of damages, and that it is entitled to judgment as a matter of law. Accordingly, on this issue, Sotheby's Motion for Partial Summary Judgment is SUSTAINED.

b. *liability for storage*

■ Although not expressed in so many words, Clay's argument with respect to Sotheby's Second Counterclaim, for storage costs, appears to be that, through its manner of dealing with her after the withdrawal of her property from sale, Sotheby's either implicitly waived its right to enforce paragraph 11 or should be estopped from so doing. Clay raises various observations and contentions in support of this general argument. *First,* she argues that because, according to the terms of paragraph 11, commissions and expenses "had to be paid" *prior* to removal of the property, Sotheby's is not entitled to collect such at this point given that the property has already been removed. *Second,* she points out that neither she nor Collins was presented with a bill, invoice, or notice of storage charges at any time prior to the filing of the counterclaims. *Third,* she contends that she understood that the two settlement checks issued to her, pursuant to the sales at the two October, 1997, auctions, in which some of her property sold, were issued after all fees and costs had been deducted. *Fourth,* she points out that in a series of letters sent from Sotheby's to either her or her various counsel, spanning a period of time from December, 1997, to March, 1999, Sotheby's never mentioned storage fees. (*See* Doc. # 46 at Exs. 4–8.)

Addressing the first point, the Court notes that storage fees are treated separately from "commissions and expenses" under the terms of the contract. As Sotheby's expert report makes clear, Sotheby's is not seeking damages for commissions and expenses, but only for storage fees. (*See* Doc. # 42 at Ex. 3, attach-

ment H.) As is made clear from a reading of paragraph 11, reprinted *supra* note 8, Sotheby's is under no obligation to collect its storage fees prior to releasing the property. Thus, Sotheby's has not acted in a manner inconsistent with the terms of the agreement.

Skipping to Clay's third point, that she was under the belief that all fees and expenses had been deducted from her settlement checks prior to their issuance, the Court finds this point irrelevant. The issuance of the settlement checks occurred prior to any accrual of post-withdrawal storage fees. Thus, they could not have been issued with storage fees in mind, notwithstanding Clay's subjective belief to the contrary.

Finally, addressing Clay's second and fourth points together, the Court believes that whether Sotheby's failure to notify Clay that storage fees were accruing manifests a waiver or gives rise to an estoppel defense, or whether waiver may also be demonstrated by Sotheby's failure to issue an invoice to Collins at the time of pick-up, or to make any mention of storage fees prior to filing the counterclaims, are questions of contract. Answering these questions, then, requires examining the governing law, which, pursuant to paragraph 16 of the consignment agreement, is that of the State of Illinois.

■ In Illinois:

To establish equitable estoppel, the party claiming estoppel must demonstrate that: (1) the other party misrepresented or concealed material facts; (2) the other party knew at the time the representations were made that the representations were untrue; (3) the party claiming estoppel did not know that the representations were untrue when the representation were made and when they were acted upon; (4) the other party intended or reasonably expected

the representations to be acted upon by the party claiming estoppel ...; (5) the party claiming estoppel reasonably relied upon the representations in good faith and to their detriment; and (6) the party claiming estoppel has been prejudiced by his reliance on the representations.

*Parks v. Kownacki,* 193 Ill.2d 164, 249 Ill.Dec. 897, 737 N.E.2d 287, 296 (2000) (citation omitted). In an early case, the Illinois Supreme Court noted the following:

> When an estoppel is claimed by reason of silence or fraud, it must be silence when there is a duty to speak, and it must be a case of false representation, with a fraudulent purpose and a fraudulent result.... As we understand the doctrine of estoppel in pais, ... [b]efore it can be invoked to the aid of a litigant it must appear that the person against whom it is invoked has, by his words or conduct, caused him to believe in the existence of a certain state of things, and induced him to act upon that belief.... A party claiming the benefit of an estoppel cannot shut his eyes to obvious facts, or neglect to seek information that is easily accessible, and then charge his ignorance to others.

*Vail v. Northwestern Mut. Life Ins. Co.,* 192 Ill. 567, 61 N.E. 651, 652 (1901) (internal quotations and citation omitted).

Here, Clay was under a contractual duty to remove her property. The contract imposed no duty upon Sotheby's to restate affirmatively the terms of the contract to Clay upon notice from her that she would not be reconsigning her property for a later auction. Clay has not pointed the Court's attention to any part in the record demonstrating that Sotheby's was consciously aware of Clay's ignorance of her obligations or that Sotheby's knowingly kept Clay in the dark, or misled her in any way. What is more, Clay has failed to adduce any evidence that she was prejudiced by Sotheby's silence. It is true that the dollar figure Sotheby's seeks on this counterclaim is quite large, but Clay has not attempted to show that she would have retrieved her property, or made other, earlier, arrangements had she been consciously aware of her obligations. As the Court understands Illinois law on the doctrine of estoppel, Clay has not demonstrated that these facts could give rise to a finding that such exists in this instance. The Court finds that there are no genuine issues of material fact on this issue, and that Clay's counter-defense that Sotheby's is estopped from collecting storage fees is without merit.

■■■ Regarding her counter-defense of waiver, in Illinois, "[w]aiver can arise either expressly or by conduct inconsistent with an intent to enforce" a known right. *In re Nitz,* 739 N.E.2d 93, 103 (Ill.App.Ct. 2000) (citation omitted). "The party claiming an implied waiver has the burden of proving a clear, unequivocal, and decisive act of its opponent manifesting an intention to waive its rights." *Id.* (citation omitted). "Parties to a contract have the power to waive provisions placed in the contract for their benefit, and such a waiver may be established by conduct indicating that strict compliance with the contractual provisions will not be required." *Id.* (citation omitted). "In order to determine the applicability of waiver, one must focus on the conduct of the nonbreaching party." *Id.* (citation omitted).

■■ The gist of Clay's argument is that Sotheby's demonstrated its intent to waive its right to collect storage costs by never invoicing her or mentioning storage charges in any of its communications with her prior the filing of its counterclaims. This argument, too, lacks merit. There are no genuine issues of material fact as to the conduct of Sotheby's; the parties sim-

ply disagree on what Sotheby's prior silence on the storage charges means. On the facts in the record, the Court does not find any evidence of intent on the part of Sotheby's to waive its rights under the consignment agreement. It had a legal right to collect storage charges once such began to accrue. The fact that it did not exercise its right prior to this litigation is not inconsistent with its intent to preserve such right. Indeed, on the contrary, it is simply consistent with its demonstrated desire to avoid litigation. As Exhibits 4 and 6 to Clay's Response (Doc. # 46) demonstrate, Sotheby's expressed a willingness to pay for the packing and return shipping of Clay's property (which it estimated would cost around six to eight thousand dollars) as early as December 23, 1997, in return for Clay releasing it from any further liability. Apparently, Clay did not accept this offer. It would be manifestly unfair to infer from Sotheby's attempts to reach an amicable, non-judicial resolution with Clay that it "clearly" and "unequivocably" waived its legal right to collect monies she owed it.

Sotheby's expert, Nelson, calculated that the damages arising from the storage of the uncollected pieces of Clay's property amount to $53,024. (*See* Doc. # 42 at Ex. 3, at 7, & attachment H.) In accord with the terms set forth in paragraph 11 of the contract, this amount represents a $1/day storage fee for each item or lot, taking into account a two-week grace period from the date on which each item or lot was first withdrawn from auction by Clay. Clay has not contested the accuracy of this figure, and the Court finds it well taken.

As no genuine issues of material fact exist with respect to Clay's counter-defense that Sotheby's waived its right to collect storage fees, it is without merit.

Having reviewed the arguments of the parties with respect to Sotheby's Second Counterclaim, the Court finds it well tak-

en. No genuine issues of material fact exist in the record as to either liability or damages, and Sotheby's is therefore entitled to judgment as a matter of law thereon. Accordingly, as its Motion for Partial Summary Judgment relates to its Second Counterclaim, it is SUSTAINED.

### III. *Conclusion*

Based on the reasoning and citation of authority set forth above, Defendant's Motion for Sanctions (Doc. # 37) is hereby OVERRULED; Defendant's Motion for Partial Summary Judgment (Doc. # 42), insofar as it relates to Clay's action, is hereby SUSTAINED in part and OVERRULED in part, as so indicated; said Motion is SUSTAINED insofar as it relates to its First and Second Counterclaims.

The merits of Plaintiff's claims for lost and/or damaged property (Third and Fourth Claims), and those of Defendant's counterclaim for costs, expenses, and reasonable attorneys' fees associated with this litigation (Third Counterclaim), remain at issue. Two additional matters are also worth mentioning. *First*, Clay has more recently filed an Amended Complaint setting forth a Fifth Claim, for fraud (Doc. # 76), in response to which Sotheby's has filed a Motion to Dismiss (Doc. # 81). *Second*, Sotheby's has filed a second Motion for Summary Judgment on Plaintiff's claims for lost and/or damaged property (Third and Fourth Claims) (Doc. # 68), on the basis that Clay has withdrawn her expert and not substituted a new one, thus negating the factual basis for recognizing the existence of any genuine issues regarding lost or damaged property. Obviously, Clay's additional claim also remains at issue, and the Court will address Sotheby's Motion to Dismiss at a subsequent point in time. In addition, because this expanded opinion merely sets forth the reasoning for

the Court's Decision and Entry of September 24, 2001 (Doc. # 59), it will leave consideration of Sotheby's second Motion for Summary Judgment, also, to a later date.